[Crim. No. 6280. Fourth Dist., Div. Two. Dec. 11, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
MARSHA LOVERCAMP, Defendant and Appellant.

## COUNSEL

Richard A. Davidson and A. Rex Victor, under appointments by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Conrad D. Petermann and Jeffrey A. Joseph, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GARDNER, P. J.**—Defendant and her codefendant, Ms. Wynashe, were convicted by a jury of escape from the California Rehabilitation Center (Welf. & Inst. Code, § 3002).

Defendant and Ms. Wynashe were inmates of the California Rehabilitation Center. They departed from that institution and were promptly captured in a hayfield a few yards away. At trial, they made the following offer of proof:

They had been in the institution about two and one-half months and during that time they had been threatened continuously by a group of lesbian inmates who told them they were to perform lesbian acts—the exact expression was "fuck or fight." They complained to the authorities several times but nothing was done about their complaints. On the day of the escape, 10 or 15 of these lesbian inmates approached them and again offered them the alternative—"fuck or fight." This time there was a fight, the results of which were not outlined in the offer of proof. After the fight, Ms. Wynashe and defendant were told by this group of lesbians that they "would see the group again." At this point, both defendant and Ms. Wynashe feared for their lives. Ms. Wynashe was additionally motivated by a protective attitude toward defendant Lovercamp who had the intelligence of a 12-year-old. It was represented that a psychiatrist would testify as to defendant's mental capacity. On the basis of what had occurred, the threats made, the fact that officials had not done anything for their protection, Ms. Wynashe and defendant felt they had no choice but to leave the institution in order to save themselves.

As indicated, they did leave and were promptly captured.

Citing *People* v. *Richards* (1969) 269 Cal.App.2d 768 [75 Cal.Rptr. 597], and *People* v. *Whipple* (1929) 100 Cal.App. 261 [279 P. 1008], the court rejected the offer of proof. The defendants then offered no evidence.

The case was submitted to the jury and to the surprise of no one the jury found both defendants guilty.

While defendant makes several contentions on appeal, one is dispositive—the offer of proof. Other issues presented may or may not recur on retrial.

Some preliminary observations are in order.

When our culture abandoned such unpleasantries as torture, dismemberment, maiming and flogging as punishment for antisocial behavior and substituted in their place loss of liberty, certain problems immediately presented themselves. As a "civilized" people, we demanded that incarceration be under reasonably safe and humane conditions. On the other hand, we recognized that the institutional authorities must be afforded a certain firmness of program by which the malefactors be kept where sentenced for the allotted period of time. Realizing that a certain percentage of penal inmates are going to be uncooperative, disruptive and, in some cases, downright dangerous, we invested our institutional officials with disciplinary powers over inmates far above any such powers granted to governmental authorities outside prison walls. It is hardly earth shattering to observe that prisons are not Brownie Camps and that within the inmate population are those who, if given the opportunity, will depart without due process of law. Therefore, as an aid to prison authorities and to discourage self-help release from incarceration, the offense of escape was born. Simply stated, if an inmate intentionally leaves lawful custody, he commits a new crime.

However, rather early in the legal history of the offense of escape, it became clear that all departures from lawful custody were not necessarily escapes or, to put it more accurately, there was a possible defense to an escape charge, to wit, necessity. In 1 Hale P.C. 611 (1736), it was written that if a prison caught fire and a prisoner departed to save his life, the necessity to save his life "excuseth the felony." So, too, we may assume that a prisoner with his back to the wall, facing a gang of fellow inmates approaching him with drawn knives, who are making it very clear that they intend to kill him, might be expected to go over the wall rather than remain and be a martyr to the principle of prison discipline.

However, the doctrine of necessity to "excuseth the felony" carried with it the seeds of mischief. It takes little imagination to conjure stories which could be used to indicate that to the subjective belief of the prisoner conditions in prison are such that escape becomes a necessity. Inevitably, severe limitations were affixed to this defense and the general rule evolved

that intolerable living conditions in prison afforded no justification for escape. A reading of the cases invoking this rule presents a harsh commentary on prison life in these United States of America, revealing (with proper consideration of the sources of the complaints), prison life which is harsh, brutal, filthy, unwholesome and inhumane. A fair sampling of the authorities indicate that the defense has been rejected in cases involving unsanitary conditions in jail—"a filthy, unwholesome and loathsome place, full of vermin and uncleanliness," (*State* v. *Davis,* 14 Nev. 439 [33 Am. Rep. 563]); fear of being shot (*Hinkle* v. *Commonwealth,* 23 Ky.L.Rptr. 1988 [66 S.W. 816]); unmerited punishment at the hands of the custodian (*Johnson* v. *State,* 122 Ga. 172 [50 S.E. 65]); or escape from solitary confinement when the cell was infested with bugs, worms and vermin and when the toilet was flushed the contents ran out on the floor (*State* v. *Cahill,* 196 Iowa 486 [194 N.W. 191]); extremely bad food, guard brutality, inadequate medical treatment and inadequate recreational and educational programs (*State* v. *Palmer,* 45 Del. (6 Terry) 308 [72 A.2d 442]). Under the above general rule, none of these situations excused the felony.

Traditionally, the courts have balanced the interests of society against the immediate problems of the escaping defendant. This has tended to focus attention away from the immediate choices available to the defendant and the propriety of his cause of action. Thus, reprehensible conditions have been found to be insufficient to justify the escape, the public interest outweighing the defendant's interest.

In a humane society some attention must be given to the individual dilemma. In doing so the court must use extreme caution lest the overriding interest of the public be overlooked. The question that must be resolved involves looking to all the choices available to the defendant and then determining whether the act of escape was the only viable and reasonable choice available. By doing so, both the public's interest and the individual's interest may adequately be protected. In our ultimate conclusion it will be seen that we have adopted a position which gives reasonable consideration to both interests. While we conclude that under certain circumstances a defense of necessity may be proven by the defendant, at the same time we place rigid limitations on the viability of the defense in order to insure that the rights and interests of society will not be impinged upon. We have not formulated a new rule of law but rather have applied rules long ago established in a manner which effects fundamental justice.

In California, the two leading authorities are *People* v. *Richards, supra,* 269 Cal.App.2d 768, and *People* v. *Whipple, supra,* 100 Cal.App. 261.

Mr. Whipple escaped because he was the victim of "brutal treatment of

extreme atrocity." The opinion was written at a time (1929) when writers, legal or otherwise, with a fine feeling for the delicacy of their readers left much to the imagination. Therefore, we are left to speculate as to the specific nature of the "brutal treatment of extreme atrocity" to which Mr. Whipple had been subjected. However, whatever treatment Mr. Whipple had received, it had occurred in a remote mountain camp where a complaint was useless.[1] He departed. His sole defense was that the conditions existing at the camp together with his brutal and inhumane treatment made his imprisonment intolerable and therefore justified the escape. The trial court instructed the jury that an escape founded on any alleged unsanitary condition or alleged harsh, brutal or inhumane treatment received by him at the hands of his custodian would constitute no defense to the charge.

On appeal, the court recognized that, generally speaking, "absolute necessity" would excuse the commission of a crime but insofar as an escape from jail was concerned, the authorities were in "practical accord" in holding that ordinary adverse circumstances did not afford such a defense. The court concluded that even if the conditions of imprisonment were so unwholesome as to seriously imperil the health and life of the prisoner or that prison guards might subject him to unjustifiable abuse or even serious physical injury, he escapes for those reasons "at his peril." Therefore, it was "with very great reluctance" that the judgment of conviction was affirmed.

Turning to the more specific problem of escape based on an alleged threat of forcible sexual attack, the reported cases reflect an attitude of the courts which might charitably be characterized as viewing it with alarm but with results varying from benign neglect to dynamic inertia.

In *Richards, supra,* 269 Cal.App.2d 768, an offer of proof was made that acts of sodomy had been inflicted on the defendant, that he complained but the guards would do nothing about it, that he had been threatened with death and that he had exhausted every possible remedy short of escape to avoid the threat of death. The trial court refused the offer of proof and refused an instruction on necessity.

*Richards, supra,* affirmed, rejecting the claim of necessity and observed that the principle of justification by necessity, if applicable, involved a determination that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged. So viewed, the court concluded that the crime of escape was a

---

[1]The court observed that while he had made no complaint, the opportunity for effective complaint was to all intents and purposes nonexistent.

greater harm than the threat of sexual assault, and that the prisoner ". . . should be relegated to relief through established administrative channels, or, that failing, through the courts." (*Richards, supra,* at p. 778.)

However, as the Attorney General concedes, there is oblique dicta in *Richards* which perhaps by negative implication suggests that if a prisoner were in immediate fear of his life or significant bodily injury and if no alternative course was availing, then perhaps the evidence might form a sufficient defense. Unfortunately for Mr. Richards, the court did not feel that the evidence was such that such a defense could be presented to the jury.

Three out-of-state cases on the subject of sexual attack against prisoners are of note.

In *State* v. *Green* (Mo.) 470 S.W.2d 565 [cert. den., 405 U.S. 1073 (31 L.Ed.2d 806, 92 S.Ct. 1491)], the Supreme Court of Missouri rejected the defense of necessity based on threats of homosexual advances, citing a previous opinion of that court and *Richards.* In *Green,* the defendant had been a victim of a series of forceful acts of sodomy committed on him by numerous inmates. He had attempted to complain to the authorities who merely told him to " 'fight it out, submit to the assaults, or go over the fence.' " (P. 566.) On the day of escape, a group of four or five inmates told him that they would be at his cell that night and he would submit to their homosexual desires or they would kill or seriously harm him. He did not report this threat to anyone and escaped that evening. The court held that the defense of necessity was not available to him mainly on the basis that he was not "being closely pursued by those who sought by threat of death or bodily harm to have him submit to sodomy." (P. 568.) The court pointed out that the threatened consequences of his refusal to submit could have been avoided that day by reporting the threats and the names of those making the threats to the authorities and that the defendant had several hours in which to consider and report these threats. The court relied on general principle "[d]efendant's defense resolves itself into the simple proposition that the conditions of his confinement justified his escape. Generally, conditions of confinement do not justify escape and are not a defense. [Citations.]" (P. 568.)

One Justice dissented, pointing out that the possibility of complaint to the authorities was illusory in view of his previous experience in which he had been told to "fight it out, submit to the assaults, or go over the fence," adding, "The majority opinion does not recommend submission, and as a practical matter, self defense was impossible. All that was left was escape, and under these circumstances, the coercion and necessity were not remote in time, but present and impending. Escape or submission (and I do not

believe defendant was unreasonable in not being willing to submit to five-fold sodomy) were literally all this defendant had left." (P. 571.)

In *People* v. *Noble* (1969) 18 Mich.App. 300 [170 N.W.2d 916], the Michigan Court of Appeal followed the same rationale in a case in which the defendant fled a prison work camp in desperation to avoid homosexual attacks by other prisoners. The court stated: "The problem of homosexuality in the prisons is serious and perplexing, and never more so than in a case such as this where such activity is forced upon a young man against his will. However, the answer to the problem is not the judicial sanctioning of escapes. While we have no reason to doubt the sincerity of this defendant, it is easy to visualize a rash of escapes, all rationalized by unverifiable tales of sexual assault. The solution must rather come from some kind of penological reform." (P. 918.)

However, in *People* v. *Harmon* (1974) 53 Mich.App. 482 [220 N.W. 2d 212], another panel of the Michigan Court of Appeal declined to follow *Noble.* In *Harmon,* the defendant offered evidence that his departure from prison was done under duress in order to avoid threatened homosexual attacks by other inmates. Evidence was adduced that the defendant had been accosted by other inmates who demanded sex from him, that he refused and had been beaten and kicked. Subsequently, he was again approached by a group of inmates who started hitting him, saying they would continue to do so until he gave them some sex. The group dispersed without having achieved their expressed goal and the next night the defendant escaped. He stated that he did not report these episodes because of fear of reprisals and a deputy warden confirmed that his fears in this respect were not unfounded. The trial court instructed the jury that even if they did find that the defendant fled to avoid homosexual attacks, such a claim would not serve as a defense to a charge of prison escape. The Court of Appeal reversed, holding that the facts were sufficient to require the submission of the defense of duress to the jury, and stated: "The time has come when we can no longer close our eyes to the growing problem of institutional gang rapes in our prison system. Although a person sentenced to serve a period of time in prison for the commission of a crime gives up certain of his rights, 'it has never been held that upon entering a prison one is entirely bereft of all his civil rights and forfeits every protection of the law.' [Citation.] Indeed, the State has a duty to assure inmate safety. [Citations.] The persons in charge of our prisons and jails are obliged to take reasonable precautions in order to provide a place of confinement where a prisoner is safe from gang rapes and beatings by fellow inmates, safe from guard ignorance of pleas for help and safe from intentional placement into situations where an assault of one type of [*sic*] another is likely to result.

If our prison system fails to live up to its responsibilities in this regard we should not, indirectly, countenance such a failure by precluding the presentation of a defense based on those facts." (P. 213.)

While agreeing with *Noble* that prison reform by the Legislature was the best solution, *Harmon* concluded: ". . . we should not, because of that fact, preclude a defendant from presenting available defenses in the courts of this state." (*People* v. *Harmon, supra,* 220 N.W.2d 212, 215.)

We, therefore, conclude that the defense of necessity to an escape charge is a viable defense. However, before *Lovercamp* becomes a household word in prison circles and we are exposed to the spectacle of hordes of prisoners leaping over the walls screaming "rape," we hasten to add that the defense of necessity to an escape charge is extremely limited in its application. This is because of the rule that upon attaining a position of safety from the immediate threat, the prisoner must promptly report to the proper authorities.

In *People* v. *Webster,* 237 Cal.App.2d 232 [46 Cal.Rptr. 699], the court approved a jury instruction to the effect that even though a prisoner escapes to save his life, " '. . . a further, continued wilful and intentional departure from the limits of custody by him will constitute the crime of escape.' " (P. 238.) The court held that such a prisoner escaping against his will would owe a duty to use reasonable efforts to render himself again to the custody of the law enforcement agency at the first available opportunity. (P. 238.) Thus, the defense becomes meaningless to one who would use it as an excuse to depart from lawful custody and thereafter go his merry way relieved of any responsibility for his unseemingly departure. A prisoner cannot escape from a threat of death, homosexual attack or other significant bodily injury and live the rest of his life with an ironclad defense to an escape charge.

From all of the above, we hold that the proper rule is that a limited defense of necessity is available if the following conditions exist: (1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future;

(2) There is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory;

(3) There is no time or opportunity to resort to the courts;[2]

---

[2]We assume that in the ordinary situation the prisoner need not wait *Noble's* "penological reform."

(4) There is no evidence of force or violence used towards prison personnel or other "innocent" persons in the escape; and

(5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat.

Applying the above rules to the offer of proof in the instant case, we find the following: (1) The prisoners were faced with a specific threat of forcible sexual attack in the immediate future. While we must confess a certain naivete as to just what kind of exotic erotica is involved in the gang rape of the victim by a group of lesbians and a total ignorance of just who is forced to do what to whom, we deem it a reasonable assumption that it entails as much physical and psychological insult to and degradation of a fellow human being as does forcible sodomy.

(2) There existed a history of futile complaints to the authorities which made the results of any belated complaint illusory.

(3) Between the time of the fight and the time the ladies went over the wall, there obviously existed no time for resort to the courts by the filing of a petition for an extraordinary writ.[3]

(4) No force was involved in the escape.

(5) Because the defendants were apprehended so promptly and in such close proximity to the institution, we do not know whether they intended to immediately report to the proper authorities at the first available opportunity. Obviously, even though the defendant may have the mentality of a 12-year-old, on retrial it must be anticipated that she will so testify. Whether that testimony is believable under the facts and circumstances of this case, will be a question of fact addressed to the jury.

Whether any of the conditions requisite to this defense exist is a question of fact to be decided by the trier of fact after taking into consideration all the surrounding circumstances. The offer of proof in the instant case was sufficient to require the submission of this defense to the jury in an appropriate manner. The trial court erred in not submitting this matter to the jury.

In summary, simply alleging an escape to avoid homosexual attack will not suffice to prevent a conviction. This defense is one with severe limitations and it must be established by competent evidence in a trial where the testimony of witnesses is subject to scrutiny by the trier of fact. The credibility to be accorded to such a proposed defense lies solely within

---

[3]Neither is it realistic that we expect the ladies to await effective "penological reform."

the function of the trier of fact and is to be determined by the facts and circumstances of each case as they arise.

We do not conceive that we have created a new defense to an escape charge. We merely recognize, as did an English Court 238 years ago, that some conditions "excuse the felony."

Judgment reversed.

Kerrigan, J., and Tamura, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 6, 1975.