445 So.2d 374 (1984)
Joseph MURO, Appellant,
v.
The STATE of Florida, Appellee.
No. 82-1030.
District Court of Appeal of Florida, Third District.
January 31, 1984.
Rehearing Denied March 7, 1984.
Bennett H. Brummer, Public Defender and Elliot H. Scherker, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen. and Jack B. Ludin, Asst. Atty. Gen., for appellee.
Before SCHWARTZ, C.J., and BARKDULL and HUBBART, JJ.
BARKDULL, Judge.
The appellant was convicted of escape from lawful custody. He contends on appeal that the trial court erred in refusing to instruct the jury on the defense of "necessity". The defendant was transported from the Monroe County jail to a hospital for treatment of injuries. The defendant was examined by a doctor and then taken for a series of X-rays. After the X-rays were taken, the defendant requested and was given permission to use the restroom. The defendant had been wearing a hospital gown and was carrying his clothing, and when he emerged from the restroom he was wearing his shirt and trousers and fled from the hospital. The defendant was apprehended approximately three hours later as he emerged from a lake onto the grounds of a golf course adjacent to the hospital. One of the officers who apprehended the defendant testified that he had not resisted when placed under arrest and that he appeared to be "hyper" and "extremely tense".
The defendant testified that he had been arrested after having been in Key West for *375 approximately two days. He testified that he had been assaulted by other prisoners in the cell block where he was incarcerated:
"... I remember that I was lying on the bench that situated along the bars; and then, the jailers opened up all the gates, so all the prisoners in each cell came out towards me. And the next thing I know, for no reason whatsoever, I was being beaten with pipes, sticks, broom handles, broom sticks and forced into the shower, where they asked me to take off all my clothes because I was bleeding and they didn't want me to bleed. They didn't want me bleeding in their cellblock, so they threw me in the shower to take the blood off; and then, they tried to force me to  they tried to stick brooms up my butt and they continued beating me, about 15 of them.
And then, the next thing I know, about 15 minutes later, the guards were pulling me out of the cellblock and I was hurting all over... ."
He further testified that the other prisoners had threatened him as he was taken out of the cellblock:
"... And the last thing they said was, `As soon as you get back, we're going to kill you and you won't be gone too long,' and they pulled me out of there and they took me to the hospital... ."
He also testified that he had told jail personnel that he had been beaten, although he had been in "a haze", and did not recall to whom he had spoken. He stated that he had described his injuries to the doctor who had examined him at the hospital, and had undergone the X-rays. He described his subsequent actions:
"... So, they took and had x-rays done and as soon as I saw the exit door, I knew where I was heading. I was going right out that door. I didn't know where I was going, but I  I didn't know where I was going or where I was; but, I knew that I didn't want to go back there from where I just came from.
* * * * * *
A. I put my clothes on, went out the exit door and I heard  I heard the officer fire at me. And I just figured he might as well kill me then, didn't matter, because I wasn't going back there. It was frigging torture and I knew I couldn't go back there. I heard him shoot and the next thing I know, everything blacked out. I guess I fainted or something. Then, I started swimming because I couldn't walk. My back and my butt was hurting so bad, so I just saw the water there later on and I just started swimming for it."
The defendant testified to his state of mind at the time of his flight from the hospital as follows:
"A. I was thinking that  I was thinking, "Oh, God, if I have to die, let it be some other way, but not with a broomstick up my butt.
* * * * * *
A. I was  I was not afraid of anything that might happen to me at the hospital. I was more afraid of  of  of coming  of being subjected to that same type of treatment that I'd received earlier, which was more like I felt like I almost died. Feeling of being beaten by 15 people just for no reason whatsoever, I knew I was heading back to that...
* * * * * *
a. I was afraid of dying in that type of situation."
On cross-examination, the defendant was questioned regarding his intentions at the time of his flight:
"Q. And you also said that you didn't know where you were going, you just knew you were going, right?
A. I just wasn't coming back here to the treatment I received and to  I thought I was going to die. I thought that then I got back, these people were going to kill me. So, I chose another way out.
Q. You weren't planning on going to turn yourself in to another agency and report it; were you?
A. At that particular time, without lying to you, I didn't know exactly what I was going to do. I didn't know exactly *376 where I was going to go. I didn't know exactly who I was. I didn't know very much. But, I did know I was running for my life; that, I did know."
The administrator of the Monroe County jail testified that he maintains records of jail beatings, which average approximately four each month, but that he had no record of the defendant having been beaten. He stated that the cellblock in which the defendant had been incarcerated was comprised of individual cells, but that the doors of the cells are not locked during daylight hours and that there are periods of time when no guards are present; he further testified that this particular cellblock has a reputation for violent occurrences.
The administrator further testified that the defendant had been transported to the hospital for injuries to his back and hands, but that it had been his impression at the time that the injuries had been suffered at the time of the defendant's arrest. He stated that he had subsequently learned that the defendant had reported the beating to the doctor at the hospital, and there should have been a report made of the incident.
The defendant submitted a written request for the following jury instruction:
"If you, the jury, find, or have reasonable doubt, that under all the circumstances shown in the evidence presented by both the Defendant and the State that the Defendant had reasonable grounds to believe that there was real, imminent, and impending danger to him of death or serious bodily harm if he did not leave the place from which he was confined and that he left because of such danger, rather than with the intent to elude lawful authority you should find him not guilty of the crime of escape."
The trial court ruled that the defendant's testimony did not establish the elements of a "necessity" defense and refused to give the requested instruction. We reverse. Section 944.40, Florida Statutes (1981), proscribes an escape or attempted escape from a jail or correctional facility. The courts have construed it as requiring proof of an intent to avoid lawful confinement and as "recogniz[ing] the `narrow but time-honored defense of necessity available to a prisoner whose escape has been motivated by sufficiently perilous circumstances ...'" Helton v. State, 311 So.2d 381, 383 (Fla. 1st DCA 1975). The application of these principles to Section 944.40 is as follows:
"... [W]hen the State has established its right to legal custody and the conscious and intentional act of defendant of leaving the established area of such custody, the offense of escape is prima facie established. In such circumstances, the only viable defense to such a charge that may be available is necessity involving, as to such defendant, reasonable grounds to believe that he is faced with real, imminent and present danger of death, great bodily harm, or such type of danger to his health, if he does not temporarily leave his place of confinement. Watford v. State, 353 So.2d 1263, 1265 (Fla. 1st DCA 1978)."
See also Bavero v. State, 347 So.2d 781, 783-84 (Fla. 1st DCA 1977); Lewis v. State, 318 So.2d 529, 530 (Fla. 2d DCA 1975), cert. denied, 334 So.2d 608 (Fla. 1976).
The defendant testified that he was under such an apprehension, based upon the beating inflicted upon him by fellow prisoners, and their threats to kill him upon his return, after he was rescued by jail guards and that this was his reason for attempting to flee from the hospital.[1] The requested instruction substantially recites the applicable law, see Helton and Watford, supra. The trial court refused to give the instruction, relying upon the decision of the First District in State v. Alcantaro, 407 So.2d 922 (Fla. 1st DCA 1981).[2]
*377 The defendant's testimony established an imminent threat to his safety, absence of time to resort to the courts, no violent acts against others, and that he had not reached a place of safety at the time of his apprehension. The defendant had complained to jail guards, and to the examining physician. The defendant's flight from the hospital clearly establishes his belief that he was about to be returned to jail, and this testimony, if believed by the jury, would have been sufficient to support a finding that there existed "no time for a complaint" or that a complaint would have been futile, since the defendant was being returned to the site of the previous  and threatened future  attack, after having complained.
When there is any evidence introduced at trial which supports the theory of defense, a defendant is entitled to have the jury instructed on the law applicable to this theory of defense when he so requests. Bryant v. State, 412 So.2d 347, 350 (Fla. 1982) (citation omitted); accord Palmes v. State, 397 So.2d 648 (Fla. 1981); Motley v. State, 155 Fla. 545, 20 So.2d 798 (1945); Rodriguez v. State, 396 So.2d 798 (Fla. 3d DCA 1981); Laythe v. State, 330 So.2d 113 (Fla. 3d DCA) cert. denied, 339 So. 1172 (Fla. 1976); Younghans v. State, 97 So.2d 31 (Fla. 3d DCA 1957). The trial court in this case having permitted the introduction of testimony in support of the "necessity" defense  which is admissible only if the criteria justifying an instruction thereon are satisfied, see Holdren v. State, supra  and that evidence being sufficient to raise the defense, the court erred in refusing to give the requested instruction.
Therefore the conviction, adjudication and sentence are reversed and the matter is returned to the trial court for purposes of a new trial.
Reversed and remanded with directions.
NOTES
[1] The parties stipulated that the defendant was in lawful custody.
[2] In Alcantaro, the court adopted a five-part predicate, established in People v. Lovercamp, 43 Cal. App.3d 823, 118 Cal. Rptr. 110 (1974), for invoking a "necessity" defense;

"(1) The Prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future;
(2) There is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory;
(3) There is no time or opportunity to resort to the courts;
(4) There is no evidence of force or violence used towards prison personnel or other `innocent' persons in the escape, and
(5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat." 407 So.2d at 925.