No. 65,451

STATE OF KANSAS, *Appellee,* v. BRANDON N. IRONS, *Appellant.*

(827 P.2d 722)

Opinion filed February 28, 1992.

*J. Patrick Lawless, Jr.,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Jeffrey E. Goering,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, *Nola Foulston,* district attorney, and *Debra Byrd Wagner,* assistant district attorney, were with him on the briefs for appellee.

The opinion of the court was delivered by

HERD, J.: Brandon N. Irons was charged with aggravated escape from custody, K.S.A. 21-3810, and at trial was found guilty by a jury. Irons took a direct appeal to the Court of Appeals,

which affirmed the district court in an unpublished opinion filed August 23, 1991. We granted Irons' petition for review.

FACTS

In 1982, at the age of 19, Brandon N. Irons was convicted of burglary and felony theft in Butler County. He was sentenced to 2 to 10 years' imprisonment. He was sent to the Kansas State Industrial Reformatory (KSIR) in Hutchinson for 18 months and was then paroled. Irons eventually moved to Colorado with his wife and child. There, Irons worked with one of his brothers as a high-rise window washer. In 1988, he was stopped in Colorado for driving under the influence of alcohol. He became belligerent with the police and, as a consequence, his parole was revoked and he was sent back to Hutchinson. Irons was then sent to the Wichita Community Residential Center (CRC) in May 1989. CRC was a privately owned work release facility where inmates were transferred from KSIR and Lansing within a year of their release date. Formerly the old stockyards building, CRC housed between 150 and 200 inmates, primarily those convicted of felonies. There were only three or four security guards on duty around the clock. None of the dormitory rooms were locked and the inmates could move around within the building as they needed. The inmates were required to get jobs and were allowed to sign in and out of CRC in order to go to work. The facility was closed in August 1989.

On June 6, 1989, Irons gave an interview to television station KAKE regarding CRC. Although the interview lasted 20 minutes, the television station only showed a few seconds. During this interview, Irons stated he did not believe that CRC was "that bad of a program." The next day, the other inmates told Irons he had been stupid to give the interview, and they were very angry with him. No one physically threatened Irons that night, but their anger was such that he was frightened about returning to his dorm room which he shared with 10 other inmates. Instead, Irons slept hidden between a soda machine and a wall in another part of the facility. During the night some inmates urinated on Irons' bunk.

The next morning, Irons returned to his dormitory room. Other inmates questioned where he had been the night before and began accusing him of being a "snitch." They called him a woman

and said any snitch could be turned into a woman. They told Irons they were going "to punk [him] out" and "dry heave" him. This was slang for sodomize. The inmates were in Irons' room, moving him toward the back door, when one said, "[W]hy don't we just take you out and why don't we just bend you over." Another one slapped him on the ear. At this point, one of Irons' friends said a counselor was coming, causing the other inmates to back off. Irons then went down and stood by the security office until he signed out to go to work. While he waited at the bus stop, two inmates appeared and began chasing him. He ran to a 7-Eleven, where they stopped chasing him but told him they were going to kill him when he returned.

Irons was working at the cinema at Towne West Shopping Center. Once he arrived at work, Irons called Judge Jaworski in Butler County, who had sentenced him. Judge Jaworski said he could not do anything and suggested Irons call security at CRC. Irons then called CRC and talked to Officer Sharon Willits, the shift supervisor. He told her he was having some problems and wanted to talk to the "top person." She advised Irons to come in and talk to CRC personnel. Irons told her if he came back the other inmates would get him, particularly if they saw him go to a guard. He had previously witnessed one inmate beat up two guards. Willits let Irons talk to Mark Ryan, CRC assistant administrator.

Irons told Ryan what had happened and that the other inmates were going to kill him. Ryan said he could move Irons to another room, but Irons replied they would still get him and did not feel he could safely come back to the facility. Ryan said he could have Irons transferred to Topeka in about a week. Irons again said he could not come back to CRC. Ryan told Irons he would call him later that evening at work. Irons waited until 5:00 or 6:00 p.m. and then called Ryan. Irons was told Ryan had left for the evening and had left no messages for Irons. Irons told CRC personnel he was not coming back and asked if he could have his return time extended from 6:00 a.m. until 9:00 a.m. It was extended until 7:00 a.m.

The following morning, June 9, 1989, Irons called Ryan at 7:00 a.m. at CRC, but Ryan was not there. Irons then called at 8:00 a.m., and Ryan was still not in. Irons called again at 10:00 or

10:30 a.m., and his counselor told him he was wanted for escape. Irons told her that Ryan was going to get him moved, but she replied Ryan was in a meeting and had said simply that Irons must return. Irons tried to explain his situation, but the counselor replied that she had no authority as to security. Irons told her he was not coming back, and he went to Texas, where he remained until he was taken into custody five months later.

Also on the morning of June 9, 1989, Officer Willits called Irons' workplace and found he was not there. She then notified the Wichita police department of Irons' escape. Irons was formally charged on June 13, 1989, with one count of aggravated escape from custody, K.S.A. 21-3810.

Prior to trial the State made a motion in limine requesting the court not to admit evidence regarding Irons' motives for escaping, specifically the threats he had received from other inmates. During the hearing on the motion in limine, Irons proffered testimony regarding the threats made to him before his escape and his attempts to talk to Ryan. Irons argued this testimony supported his defense of compulsion. The trial court granted the State's motion in limine, finding the threats were not "imminent," and thus, as a matter of law the defense of compulsion was not available to Irons. Prior to presentation of the defense's case, the defendant unsuccessfully moved the court to reconsider the motion in limine. At that time, Irons also proffered testimony of Bradley Bates, a man who worked with defendant at the movie theatre, and to whom the defendant had relayed his fears.

Irons was convicted by a jury on May 30, 1990. He filed a motion for acquittal and a motion for new trial on June 5, 1990. The motion for new trial again raised the issues of the compulsion defense and the trial court's failure to give an instruction on compulsion. Both motions were denied and Irons was sentenced to one to five years' imprisonment, to run consecutively with the previous Butler County conviction. Irons' appeal followed.

The first issue is whether the trial court abused its discretion by granting the State's motion in limine, thereby denying Irons a chance to present the defense of compulsion.

Irons had planned to present evidence at trial to support his claim of the defense of compulsion. Compulsion is statutorily defined at K.S.A. 21-3209 as follows:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

The State, however, made a motion in limine requesting that any evidence of Irons' motives for leaving CRC not be admitted. Relying upon *State v. Milum*, 213 Kan. 581, 516 P.2d 984 (1973), the State argued Irons was not in imminent fear of death or great bodily harm and, therefore, could not claim compulsion.

In *Milum*, the defendant planned to present the defense of compulsion to justify his escape from the Kansas State Penitentiary. Prior to the presentation of evidence, the State "entered a preliminary objection in chambers to 'any testimony concerning the defendant's motives for leaving the Kansas State Penitentiary.' " The defendant proffered testimony that a deputy warden had threatened to kill him in June or July 1970, motivating the defendant to escape on August 7, 1970. The trial court sustained the objection "'on the basis of the lack of relevancy.' " This court affirmed the trial court, stating: "Milum's evidence in its most favorable light would have shown no immediate threat; since it would not establish the supposed defense it was not error to exclude it." 213 Kan. at 582-84.

In the case at bar, the trial court agreed with the State's analysis that once Irons got to work at Towne West he was no longer in imminent danger. Thus, the trial court found as a matter of law the proffered testimony did not constitute facts which would satisfy the requirements of the defense of compulsion and granted the State's motion in limine. Therefore, at trial Irons, Willits, Ryan, and Bates were not allowed to testify to any threats toward Irons made by other inmates nor to any phone calls Irons had made to CRC on June 8 and 9.

On appeal, the Court of Appeals applied the rules of law pertaining to the compulsion defense stated in *State v. Pichon*, 15 Kan. App. 2d 527, 811 P.2d 517, *rev. denied* 249 Kan. 778 (1991), which also dealt with a defendant charged with aggravated escape from custody. The *Pichon* decision was filed on May 10, 1991, and oral argument of this case before the Court of Appeals was held on May 13, 1991.

In *Pichon*, the Court of Appeals adopted, with slight modification, the conditions that must exist before a prison escapee can claim the defense of compulsion as stated in *People v. Lovercamp*, 43 Cal. App. 3d 823, 118 Cal. Rptr. 110 (1974). The conditions are:

(1) The prisoner is faced with a threat of imminent infliction of death or great bodily harm;

(2) there is no time for a complaint to the authorities or there exists a history of futile complaints which makes any result from such complaints illusory;

(3) there is no time or opportunity to resort to the courts;

(4) there is no evidence of force or violence used towards prison personnel or other "innocent" persons in the escape; and

(5) the prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat. *Pichon*, 15 Kan. App. 2d at 533, 536.

When considering Irons' appeal, the Court of Appeals further explained:

"This court held that all of the five conditions must exist before the defense is available. *Pichon*, 15 Kan. App. 2d at 533. Other courts have held that the existence of all five is not required before the defendant may present the defense. *People v. Unger*, 66 Ill. 2d 333, 342, 362 N.E.2d 319 (1977); *Esquibel v. State*, 91 N.M. 498, 501, 576 P.2d 1129 (1978). Those courts held that the existence or nonexistence of the factors goes only to the weight and credibility of the defendant's evidence of duress or necessity."

Relying upon *State v. Hundley*, 236 Kan. 461, 693 P.2d 475 (1985), the Court of Appeals discussed at length the difference between "immediate" and "imminent." *Hundley* was a murder case involving the battered woman syndrome in which the defendant argued the defense of self-defense. On appeal, the defendant contended the self-defense instruction used was reversible error because it stated the defendant must reasonably believe she is faced with "immediate use of unlawful force" rather than

the "imminent use of unlawful force" as stated in the statute. 236 Kan. at 464. This court stated:

"Thus, the question is whether the instruction allows the jury to consider 'all the evidence' or whether the use of the word 'immediate' rather than 'imminent' precludes the jury's consideration of the prior abuse. 'Immediate' is defined in Webster's Third New International Dictionary (1961): 'Occurring, acting or accomplished without loss of time.' p. 1129. 'Imminent' is defined as: 'Ready to take place . . . or impending.' p. 1130. Therefore, the time limitations in the use of the word 'immediate' are much stricter than those with the use of the word 'imminent.' " 236 Kan. at 466.

The Court of Appeals acknowledged the inmates had threatened Irons immediately before he left CRC. Unlike in *Milum,* the threats were not for some indefinite time in the future. Therefore, the Court of Appeals concluded Irons was in imminent threat of death or great bodily harm and "[t]he trial court erred by refusing the testimony for this reason."

The Court of Appeals went on to determine whether Irons was able to meet the other four conditions required by *Pichon.* It found Irons could meet the second requirement of making complaints to the authorities or showing there exists a history of futility when complaints are registered, the third requirement that there is no time or opportunity to resort to the courts, and the fourth requirement that there is no evidence of force or violence used in the escape. The Court of Appeals, however, found Irons could not meet the fifth requirement of immediately reporting to the proper authorities once he reached safety. Thus, the Court of Appeals affirmed the trial court on this issue because the trial court reached the right result for the wrong reason. See *State v. Shehan,* 242 Kan. 127, 131, 744 P.2d 824 (1987).

Judge Davis dissented, stating he believed "all conditions of *Pichon* have been satisfied." Judge Davis further stated:

"Whether it was a viable defense depends upon the jury's determination of the evidence at trial. To say under the facts of this case that the defense of compulsion is not available is to deny the defendant a fair trial by preventing him from presenting to the jury the only theory of defense he had.

"I believe *Pichon* to be good law but I read it more restrictively than the majority. In my opinion, it is not enough to say that, since the defendant did not immediately report to the proper authorities when reaching Texas, he forfeits his defense of compulsion. This is especially true under the facts of this case where the defendant sought to report the danger he perceived. The authorities offered a solution that not only failed to alleviate the danger

but virtually guaranteed that the threat he perceived would be carried out if he returned. I believe that, in this case, the last requirement of *Pichon* was met by the defendant when, safe at his place of employment and before returning to the facility, he reported to the proper authorities."

We agree with Judge Davis. As we stated in *State v. Bradley*, 223 Kan. 710, 714, 576 P.2d 647 (1978): "It is fundamental to a fair trial to allow the accused to present his version of the events so that the jury may properly weigh the evidence and reach its verdict. The right to present one's theory of defense is absolute."

Here, the trial court and the Court of Appeals assumed Irons did not escape until he reached Texas, even though Irons repeatedly told authorities he would not return to CRC. Viewing the evidence in the light most favorable to the defendant, Irons reported the threats to the authorities, who offered him no viable alternative, forcing him to fail to return. Moreover, motions in limine are not to be used to "choke off a valid defense in a criminal action." *State v. Quick*, 226 Kan. 308, 311, 597 P.2d 1108 (1979). Irons' escape occurred when he did not return to CRC by 7:00 a.m. He made every effort to report to Ryan at that time and previously. Thus, he met the requirements of all the conditions entitling him to the defense of compulsion.

We find the trial court abused its discretion in granting the State's motion in limine. Irons proffered evidence which would satisfy each of the five requirements of *Pichon*, and his defense of compulsion should have been presented to the jury with appropriate instructions.

We adopt the conditions set out in *Pichon* with one modification. Condition (5) should contain the phrase "imminent threat," rather than "immediate threat," to conform to K.S.A. 21-3209.

The judgments of the Court of Appeals and the district court are reversed, and the case is remanded for new trial.