(896 P.2d 1101)

No. 71,631

STATE OF KANSAS, *Appellee*, v. DANNY LEE KELLY, *Appellant*.

Opinion filed June 9, 1995.

*Michael L. Helvey*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for appellant.

*Debra S. Peterson*, assistant district attorney, *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, for appellee.

Before BRAZIL, C.J., LARSON, J., and DANIEL L. LOVE, District Judge, assigned.

BRAZIL, C.J.: Danny Lee Kelly appeals his conviction of aggravated escape from custody. He argues that the trial court erred in concluding that the compulsion defense was not available and refusing to instruct on it. We affirm.

Kelly testified that while he was incarcerated in a minimum security prison in Hutchinson, he became concerned for his son. He testified that his wife, Ginger, used cocaine and sold food stamps to buy drugs. On one occasion when Ginger brought their son to visit, Kelly noticed that the boy had burn marks on his neck. Ginger told Kelly that the boy fell on a furnace vent.

Kelly testified that out of concern for his son, he "begged" to be transferred to a Wichita work release facility so he could help support his wife and son there. About a month after his transfer to Wichita, Kelly missed the state transportation to his job. He made arrangements to take the bus to work. Instead of going directly to work, Kelly stopped to see his wife and child on the way.

Kelly encountered a man named Marty Soliz, who claimed to be Ginger's husband. Ginger was not at home. Kelly testified that the house was "a total pig sty," and that his son was crying in his crib. The sink was full of dirty dishes, and the refrigerator was "virtually

empty" except for a tub of cottage cheese, which Ginger's four older children ate for breakfast.

Kelly called his employer and told him that he was taking his son to the hospital. He acknowledged that this was a lie designed to buy himself more time. Kelly instead went in search of Ginger. He did not take his son with him because he feared being charged with kidnapping. Kelly found Ginger, they argued, and Kelly told Ginger she could either turn the boy over to Kelly's mother or Kelly would take him away.

Kelly returned to a friend's home across the street from Ginger's home to watch the house. Kelly saw Marty take all the children from the house. They never returned. Kelly contacted Ginger by phone, but she would not tell him where his son was. Kelly did not realize that Ginger had taken their son to stay with Kelly's mother. Kelly was arrested about five days later and was charged with aggravated escape from custody.

Kelly argues that the trial court erred in concluding that the compulsion defense was not available and refusing to instruct the jury on it. Kelly requested the instruction at trial.

Whether the compulsion defense is available to a defendant is a matter of law determined by the court. *State v. Pichon,* 15 Kan. App. 2d 527, 536, 811 P.2d 517, *rev. denied* 249 Kan. 778 (1991). The compulsion defense is set out in K.S.A. 21-3209:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

The defense has been narrowed somewhat in its application to a charge of escape from custody. This court has held that the compulsion defense is not available in escape cases unless all of the following conditions are met:

" '(1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future;

" '(2) There is no time for a complaint to the authorities or there exists a history of futile complaints which makes any result from such complaints illusory;

" '(3) There is no time or opportunity to resort to the courts;

" '(4) There is no evidence of force or violence used towards prison personnel or other "innocent" persons in the escape; and

" '(5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat.' " *State v. Pichon*, 15 Kan. App. 2d at 533.

The Kansas Supreme Court later modified the fifth condition to require an "imminent" rather than immediate threat. *State v. Irons*, 250 Kan. 302, 309, 827 P.2d 722 (1992).

The trial court held that Kelly did not meet the first condition because the threat to his child was not imminent. The State pointed out that threat to third parties was not included in the compulsion defense to a charge of escape from custody. The trial court stated that it had "no problem" extending the first condition to include threats to third parties.

In *Pichon*, this court adopted the five-factor test set out in *People v. Lovercamp*, 43 Cal. App. 3d 823, 118 Cal. Rptr. 110 (1974). The California court in *Lovercamp* traced the history of the offense of escape from custody and the defense of necessity, similar to that of compulsion. The court stated that the traditional balancing test measured the interests of society against the immediate concerns of the escapee. The court noted that "[i]n a humane society some attention must be given to the individual dilemma," however, "[i]n doing so the court must use extreme caution lest the overriding interest of the public be overlooked." 43 Cal. App. 3d at 826-27.

One court has stated that an escapee's concern for third persons does not entitle the escapee to the defense of necessity. *People v. White*, 78 Ill. App. 3d 979, 397 N.E.2d 1246 (1979). In *White*, the defendant left a community correctional facility for an authorized job interview. While on the interview, White called a friend, who told him that White's wife had been raped and his daughter beaten. White's wife had no phone, so White could not verify the report. White hitchhiked to another town, ostensibly to see his wife and daughter in the hospital. 78 Ill. App. 3d at 980.

After an offer of proof, the trial court granted the State's motion in limine seeking to exclude evidence of the reasons for White's

escape and his subsequent voluntary surrender. The trial court reasoned that the wife and daughter had already been harmed and stated that White's concern for them did not justify the necessity defense. 78 Ill. App. 3d at 980.

The Illinois appellate court affirmed, noting that under the doctrine of necessity, an escapee must be faced with a choice between two evils. The court held that White had a third choice in the form of requesting emergency leave available to those in a community corrections program for family emergencies. The court also noted the decision in *Lovercamp* and concluded that under its test, "[w]e cannot equate defendant's subjective concern for his family with threats of death or forcible sexual assaults." 78 Ill. App. 3d at 982.

A similar sentiment appears in *State v. Moore,* 621 S.W.2d 107 (Mo. App. 1981). Moore escaped with a fellow inmate from prison. Moore attempted to present evidence of pressing family problems to prove he did not have the requisite intent to commit the crime of escape. The Missouri appellate court upheld the trial court's grant of the State's motion in limine excluding evidence of family problems. The court recognized that "[t]o hold otherwise would be an invitation to anarchy, and make the duties of prison administration intolerable." 621 S.W.2d at 109.

Here, the trial court was willing to extend the compulsion defense to escape to encompass situations where the escapee left captivity to prevent harm to a third party. We disagree and conclude that it would be contrary to the plain language of the factors set out in *Lovercamp, Pichon,* and *Irons.* Including third parties simply provides those held in prisons or community corrections programs an excuse to leave anytime a family member is perceived to be in danger. This would invite the sort of anarchy described in *Moore.*

Further, allowing those confined to leave confinement to save a family member from harm does not comport with the balancing test set forth in *Lovercamp.* The overriding interest of the public cannot be served by those imprisoned for all manner of felonies escaping from prison to aid a family member in distress. Imprisonment by its nature not only restricts the inmate's physical free-

dom, but also curtails the inmate's ability to function as a member of his or her family—as breadwinner, nurturer, or protector.

We conclude that the compulsion defense to escape from custody does not apply where the imminent threat is not to the inmate, but to third parties. With this holding, we conclude that the trial court was right for the wrong reason and uphold the decision that the compulsion defense was not available to Kelly. See *State v. Wilburn*, 249 Kan. 678, 686, 822 P.2d 609 (1991).

Kelly argues that the trial court erred in refusing to allow his witnesses to testify in support of his compulsion defense. "Admission or exclusion of evidence is within the sound discretion of the trial court." *Pichon*, 15 Kan. App. 2d at 532. Based on our conclusion that the compulsion defense was not available to Kelly, this issue is moot.

Kelly then argues that the trial court violated his right to remain silent and his due process rights when it compelled him to testify first during his case in chief and in front of the jury.

Even if the trial court somehow erred in compelling the defendant to testify first, the error is harmless.

"An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. . . . [B]efore we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial." *State v. White*, 246 Kan. 28, 37, 785 P.2d 950, *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 (1990).

Kelly suggests on appeal that he would have been better off not testifying. He stops short of arguing that had he known the other witnesses would not be allowed to testify, he would not have testified himself. Kelly's argument has no merit.

Kelly argues that the trial court in essence forced him to testify before he knew whether his corroborating witnesses would be allowed to testify. Kelly's only defense was compulsion, which we now hold was not available to him. Of the defense witnesses, he was the only one who could establish even one of the elements of the defense. Kelly's argument that he would have been better off not to testify is absurd. Had Kelly not testified, the State would have established a prima facie case against him, and he would have

presented no witnesses to rebut it. The trial court's decision to compel Kelly to testify first, if error, was harmless beyond a reasonable doubt.

Kelly finally argues that the trial court should have allowed him to submit a proffer of his testimony outside the presence of the jury to establish the elements of the compulsion defense. Kelly did not request such a proffer. Kelly's testimony centered on the compulsion defense and his reasons for leaving community corrections. The testimony did not prejudice his defense; if anything, the testimony cast him in a more sympathetic light. The court's failure to suggest a proffer, if error, was harmless.

Kelly complains that remarks by the State in its closing argument, which he objected to, deprived him of a fair trial.

"The general rules relative to claims of prosecutorial misconduct in closing arguments are as follows. Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and deny him a fair trial. [Citation omitted.] The prosecutor is entitled to considerable latitude in arguing the case to a jury. . . . Remarks made by the prosecutor in closing argument are harmless error if the court finds that the error had little likelihood of changing the result of the trial." *State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 (1991).

It is helpful to first place the complained-of remarks in context. Kelly argued in closing that he did not possess the requisite criminal intent to commit the crime of escape. Kelly argued:

"[I]t's clear in the evidence or at the very least there's reasonable doubt in the evidence, that when Danny left the custody of the work release facility that morning to go to his job that he didn't intend to escape. What he intended to do was check on the welfare of his child. And he felt that he could do that and still get back to his job and still get back to the work release facility that night. That's what was in his head. That was his intent at the time he left the facility."

Kelly concluded that "there was not the intent to make an escape that morning, that the intent was to look after this child, and the intent wasn't criminal, the intent was humane."

The State responded to these arguments in closing:

"[D]efense counsel . . . was trying to put a slightly greater burden on the State than what is required. The State doesn't have to prove that he intentionally committed the crime necessarily. What they have to prove is he intentionally did those acts which constitute a crime in this case. Now if he—if you find that he—the

things that he did were intentional, the acts he committed were intentional, then the instructions allow you to find, as it states in No. 4, you can determine intent or lack of intent by inferring that intent from all the evidence in this case. No one can get inside this person's head to determine what he was thinking on that day. The State only has to show that the acts were intentional, not necessarily that he intended to go out and commit this crime, that the acts were, in fact, intentional."

Kelly argues that the State falsely suggested that it need not prove the element of criminal intent. Kelly mischaracterizes the State's comments. The State did not argue that it need not prove intent at all, only that it need not prove that Kelly intended to violate the escape statute.

K.S.A. 1994 Supp. 21-3201 states that "[c]riminal intent may be established by proof that the conduct of the accused person was intentional or reckless. . . . Intentional conduct is conduct that is purposeful and willful and not accidental." Further, the State is "not obligated to prove an intent to violate a particular statute but rather the intent to do the criminal act which violated the statute." *State v. Kirtdoll*, 206 Kan. 208, 209, 478 P.2d 188 (1970).

The State's remarks were not a misstatement of the law. At worst, they were somewhat confusing. However, the remarks were made in order to clarify Kelly's equally muddled argument about criminal intent. "There is no prejudicial error where the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel." *State v. Baker*, 249 Kan. at 446. The State's remarks did not deprive Kelly of a fair trial.

Affirmed.