614 P.2d 820

**The STATE of Arizona, Appellee,**

v.

**Michael James MULALLEY, Appellant.**

**No. 4770.**

Supreme Court of Arizona,
In Banc.

June 23, 1980.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Gerald R. Grant, Asst. Attys. Gen., Phoenix, for appellee.

Kemper & Henze by James Hamilton Kemper, Phoenix, for appellant.

CAMERON, Justice.

This is an appeal from a jury verdict and judgment of guilt to the crime of escape, A.R.S. § 13–395,[1] with a sentence of not less than four nor more than five years in prison, said sentence to be consecutive to punishment imposed in Pima County Cause No. A–31908, and in the first five counts of Maricopa County Cause No. CR–103536. Because we considered the appeal in the companion Maricopa County case, we elected to consider this appeal even though we would not normally take initial jurisdiction where the punishment actually imposed was less than life imprisonment. A.R.S. § 12–120.21.

We must answer two questions on appeal:
1. Did the trial court properly admit the defendant's statements concerning his escape?
2. Did the trial court err in refusing to instruct on the question of duress as a defense to the escape?

The facts necessary for a determination of this matter are as follows. Defendant had been previously convicted of a felony and was an inmate in the Arizona State Prison. While at the prison, defendant had witnessed an assault and indicated that he was willing to testify against the prisoner who had committed the assault. To protect the defendant's safety, he was transferred to the Chandler Jail. He was eventually given trustee status and though observed by a jailer on 23 August 1978 at about 4:30 p. m., defendant did not return to his cell at 8:00 p. m. It was not ascertained that he had escaped until the next morning.

Defendant was returned to custody later on 24 August and, as a result of events occurring during his absence from jail, was charged with six felonies. The first five—burglary, lewd and lascivious acts, aggravated battery, first degree rape, and armed robbery—were tried separately; and defendant was convicted on all five counts. His convictions were affirmed by this court in a memorandum decision. Defendant was later tried and convicted of the crime of escape, which conviction resulted in this appeal.

## WERE DEFENDANT'S STATEMENTS VOLUNTARY?

██ After defendant was apprehended on 24 August, a Tempe police officer, Joe N. Smith, went to the Chandler Jail to obtain defendant's clothing in connection with the first five charges or counts. After

---

1. Title 13 citations in this opinion are to the Arizona Criminal Code as it existed prior to its extensive revision effective 1 October 1978.

advising the defendant of his *Miranda* rights, he asked defendant if he would answer some questions. Defendant said that he "would think about it." Smith tried to ask some other questions and defendant said that he didn't "want to talk at all about it." About an hour later, Smith saw the defendant in the courtroom of the Tempe Justice Court. Officer Smith testified as follows:

"Q  Now, you've indicated that 50 minutes to an hour later at the Tempe Police Justice Court you had a second contact with him?

"A  That is correct.

"Q  Was there anyone else present?

"A  No, there wasn't.

"Q  Where were you, where was he, and what was happening at that point?

"A  Well, we were in a courtroom such as this with no one else there. He was seated at a table such as you're seated at, and I was sitting on a table next to the one he was at. And I asked him if he wanted a drink of water, or Coke or something. We started a conversation in that manner.

"Q  Did he get anything to drink, or do you recall?

"A  Yes. I think it was a Coke; I'm not sure.

"Q  Was there anything said at that time and place?

"A  Yes, there was.

"Q  And who initiated the conversation?

"A  Well, he asked me, inquiring about some airplanes that he had seen the night before. He thought that they were looking for him. And I didn't know what he was talking about, so I asked him what he was talking about.

"Q  Do you recall how he asked that specific question? In other words, what words he used at that time?

"A  I don't recall his exact words. He said something about, 'How many planes were looking for me last night?' or, 'What were those planes looking for, me, last night?' something like that.

"Q  What happened next? What was the next thing that came up?

"A  Well, I didn't realize what he was talking about. And we got into the planes, and he said that they had lights on them and that he was hiding in a field. And I asked him what he was hiding there for. And at that time he told me that he had gotten away from the Chandler Jail. And at that time I surmised that the planes were crop dusters.

"Q  Okay. Now, do you recall, when he indicated he had gotten away from the Chandler Jail, do you recall the terminology that he used?

"A  The terminology was 'walked away.' "

After the hearing, the court ruled that the statements were voluntary and admitted them into evidence.

In *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the so-called "Christian burial case," the defendant had asserted his right to counsel in Davenport, Iowa, where he was arrested. His counsel there had advised him not to make any statements until after consulting with his counsel in Des Moines, Iowa, the place of the crime. While transporting Williams to Des Moines, a police officer got the defendant to lead him to the murder victim's body by playing upon defendant's religious beliefs. A majority of the United States Supreme Court held that the officer's conduct constituted an interrogation in violation of defendant's expressed desire to have assistance of counsel and that the evidence should have been suppressed. The court stated:

"Despite Williams' express and implicit assertions of his right to counsel, Detective Leaming proceeded to elicit incriminating statements from Williams. Leaming did not preface this effort by telling Williams that he had a right to the presence of a lawyer, and made no effort at all to ascertain whether Williams wished

to relinquish that right. The circumstances of record in this case thus provide no reasonable basis for finding that Williams waived his right to the assistance of counsel." *Brewer v. Williams,* supra, 430 U.S. at 405, 97 S.Ct. at 1243, 51 L.Ed.2d at 440–41.

Recently, however, the United States Supreme Court, in a somewhat similar fact situation, has affirmed the admission of statements made after assertion of right to counsel. In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the defendant was arrested in connection with the shotgun murder of a cab driver. After arrest, defendant was advised three times of his right to counsel and defendant indicated he wanted an attorney. Three officers were ordered to take the defendant to the station but not to interrogate the defendant. While transporting the defendant, the officers talked among themselves about the fact that there was a school for handicapped children nearby and if a child should find the murder weapon he might be injured. Defendant overheard the conversation and asked the officer to return to the scene so that he could show them where to find the shotgun. He was returned and again read his rights. He then showed the officers where the gun was located. The Rhode Island Supreme Court, relying upon *Brewer,* supra, ruled the gun inadmissible. *State v. Innis,* 391 A.2d 1158 (R.I.1978). The United States Supreme Court reversed the Rhode Island Supreme Court stating:

"Turning to the facts of the present case, we conclude that the respondent was not 'interrogated' within the meaning of *Miranda.* It is undisputed that the first prong of the definition of 'interrogation' was not satisfied, for the conversation between Patrolmen Gleckman and McKenna included no express questioning of the respondent. Rather, that conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from the respondent was invited.

"Moreover, it cannot be fairly concluded that the respondent was subjected to the 'functional equivalent' of questioning. It cannot be said, in short, that Patrolmen Gleckman and McKenna should have known that their conversation was reasonably likely to elicit an incriminating response from the respondent. There is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest. (footnote omitted)

"The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off-hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly 'evocative.' It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

"The Rhode Island Supreme Court erred, in short, in equating 'subtle compulsion' with interrogation. That the officers' comments struck a responsive cord is readily apparent. Thus, it may be said, as the Rhode Island Supreme Court did say, that the respondent was subjected to 'subtle compulsion.' But that is not the end of the inquiry. It must also be established that a suspect's incriminating response was the product of words or actions on the "part of the police that they should have known were reasonably likely to elicit an incriminating response. (footnote omitted) This was not estab-

lished in the present case." *Rhode Island v. Innis,* supra, 446 U.S. at 303, 100 S.Ct. at 1690, 64 L.Ed.2d at 308.

We believe, pursuant to *Innis*, supra, that defendant's refusal to talk about the rape did not preclude the admission of defendant's later statements to the officer about the escape. The actions of Officer Smith in the instant case did not even approach the "subtle compulsion" found objectionable by the Rhode Island Supreme Court and approved by the United States Supreme Court. We cannot say that the defendant's response was the product of "words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Innis,* supra. We find no error.

## INSTRUCTIONS ON DURESS

During trial, testimony concerning the dangerous conditions at the Arizona State Prison was presented. This testimony indicated that inmates who snitch were considered "fair game." There was testimony that five other inmates were at the Chandler Jail. A jailer at the Chandler Jail, however, testified he was unaware of any physical violence at the jail. The defendant testified that he had been threatened at the Arizona State Prison if he testified for the State and that others had been stabbed or assaulted and at least one inmate at the Chandler Jail knew he was a snitch.

■ Defendant asked for two instructions which would justify defendant's escape based on threats of physical force, death or serious bodily harm. These instructions were not given, but instead the following instruction was given:

"An escape is not justified on the ground that conditions of imprisonment are such so as to give the prisoner or escapee reason to believe or fear for his personal safety."

This instruction given by the court was based on a prior Arizona case in which we stated that prison or jail conditions afford no justification for escape. *State v. Alberigo,* 109 Ariz. 294, 508 P.2d 1156 (1973). In that the instruction followed *Alberigo*, it

was a correct statement of the law in Arizona.

■ Defendant, however, relies upon two decisions of the United States Court of Appeals for the District of Columbia which reversed two convictions for escape holding that the trial court should have allowed the jury to consider coercive jail conditions in determining the defendants' guilt. *United States v. Bailey,* 585 F.2d 1087 (C.A.D.C. 1978) and *United States v. Cogdell,* 585 F.2d 1130 (C.A.D.C.1978) (both cases reversed 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575, 1980). The United States Supreme Court reversed the United States Court of Appeals, but based its decision on the fact that the defendants, having been gone for over a month, had to show that they were willing to return to custody as soon as the coercive jail conditions were no longer present. The United States Supreme Court stated:

"* * * Since we have determined that this is an indispensable element of the defense of duress or necessity, respondents were not entitled to any instruction on such a theory. Vague and necessarily self-serving statements of defendants or witnesses as to future good intentions or ambiguous conduct simply do not support a finding of this element of the defense." *United States v. Bailey,* 444 U.S. at 415, 100 S.Ct. at 637, 62 L.Ed.2d at 594 (1980).

In the instant case, the defendant was gone for less than 24 hours. Because he did not have time to present himself for reincarceration, it would not be reasonable to require him to return to custody before allowing a plea of coercion and necessity. We do not believe that *Bailey*, supra, applies to the facts of this case.

There is, however, some language in *Bailey* suggesting that if conditions were sufficiently bad duress or necessity would be a valid defense. Mr. Justice Blackmun, in his dissent, stated:

"Although the Court declines to address the issue, it at least implies that it would recognize the common law defenses of

duress and necessity to the federal crime of prison escape, if the appropriate prerequisites for assertion of either defense were met." *United States v. Bailey,* supra, 444 U.S. at 425, 100 S.Ct. at 642, 62 L.Ed.2d at 600.

Even if we assume that the United States Supreme Court would require us to recognize the defense of duress and necessity to the crime of escape, we do not believe the conditions described by the defendant would justify such an instruction in this case. There was no evidence of any threats or force against defendant while at the Chandler Jail. We find no error. *State v. Alberigo,* supra.

Judgment affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and GORDON, JJ., concur.