## STATE OF CONNECTICUT *v.* PAUL VARSZEGI
(15219)

Peters, C. J., and Borden, Berdon, Norcott and Katz, Js.

Argued October 31, 1995—decision released March 19, 1996

*James J. Ruane*, special public defender, with whom, on the brief, were *James O. Gaston* and *Nancy A. DeRose*, for the appellant (defendant).

*Frederick W. Fawcett*, assistant state's attorney, with whom, on the brief, were *Donald A. Browne*, state's attorney, and *Richard L. Palombo, Jr.*, assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant, Paul Varszegi, was convicted of attempted escape in the first degree in violation of General Statutes §§ 53a-49[1] and 53a-169 (a) (1)[2] and criminal mischief in the second degree in violation of General Statutes § 53a-116 (a) (1).[3] The Appellate Court affirmed the judgment of conviction and we granted the defendant's petition for certification limited to review of the Appellate Court's resolution of the following issues: (1) "Was the defendant deprived of a constitutional right when he was impeached at trial by evidence of a prior conviction that was subsequently reversed on the ground of insufficient evidence?" (2) "If there was such a deprivation, was the error harm-

---

[1] General Statutes § 53a-49 provides in relevant part: "Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[2] General Statutes § 53a-169 provides in relevant part: "Escape in the first degree: Class C felony. (a) A person is guilty of escape in the first degree (1) if he escapes from a correctional institution . . . ."

[3] General Statutes § 53a-116 provides in relevant part: "(a) A person is guilty of criminal mischief in the second degree when: (1) With intent to cause damage to tangible property of another and having no reasonable ground to believe that he has a right to do so, he damages tangible property of another in an amount exceeding two hundred fifty dollars . . . ."

less?" and (3) "Was the Appellate Court correct in holding that an objective test is employed in determining whether the defendant was entitled to have submitted to the jury the defense of necessity?" *State* v. *Varszegi*, 233 Conn. 912, 659 A.2d 184 (1995). We affirm the judgment of the Appellate Court.

The jury reasonably could have found the following facts. On March 1, 1992, the defendant was incarcerated at the Bridgeport correctional center. After having noticed suspicious activity in the defendant's cell, a correction officer inspected the cell and found a hacksaw, which had been used to cut the bars on the cell window. The defendant admitted to the officer that he had cut the bars on the window. The defendant was charged with attempted escape in the first degree and criminal mischief in the second degree. At trial, the defendant testified and introduced evidence to show that he was motivated to escape because: (1) he was fearful of assault by other inmates; (2) he was not receiving proper medical care; and (3) he was in danger of contracting tuberculosis. *State* v. *Varszegi*, 36 Conn. App. 680, 682, 653 A.2d 201 (1995). He claimed that this evidence was sufficient to entitle him to a jury instruction on the common law defense of necessity. The trial court disagreed and rejected his request. The Appellate Court agreed with the trial court. At trial, the state impeached the defendant with a prior larceny conviction that was, at the time of trial, on appeal to the Appellate Court. Following the trial in the present case, the Appellate Court reviewed the prior larceny conviction, concluded that there was insufficient evidence to support it and, consequently, remanded the case to the trial court with direction to render a judgment of not guilty on the charge of larceny in the third degree. See *State* v. *Varszegi*, 33 Conn. App. 368, 375, 635 A.2d 816 (1993), cert. denied, 228 Conn. 921, 636

A.2d 851 (1994). Additional facts will be presented in each part of this opinion as needed.

## I

The first certified question addresses the defendant's claim that his constitutional rights to a fair trial and to due process of law were violated when he was impeached at trial by evidence of a prior conviction that was subsequently reversed on the ground of insufficient evidence.[4] The defendant claims that his right to due process was violated by the state's use of his prior larceny conviction, subsequently reversed for insufficient evidence, to impeach him at trial. This claim has several subparts. First, the defendant asserts that a conviction obtained in the absence of sufficient evidence is as violative of the defendant's right to a fair trial as one obtained in violation of the sixth amendment right to counsel; *Gideon* v. *Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); in the absence of an impartial tribunal; *Tumey* v. *Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 71 L. Ed. 2d 749 (1927); and in violation of the right to remain silent. *Biller* v. *Lopes*, 834 F.2d 41, 46 (2d Cir. 1987). Second, he asserts that all such convictions must be reversed without engaging in harmless error analysis. Finally, he asserts that any conviction resulting from a trial in which he had been impeached by a prior conviction reversed for insufficient evidence must also be reversed without engaging in harmless error analysis. We are unpersuaded.

The following additional facts are relevant to the defendant's claim. Prior to the defendant's trial in the

---

[4] Although the defendant purports to present an independent state constitutional analysis under article first, § 8, of the Connecticut constitution, his analysis is incomplete. Moreover, nothing in the limited analysis that he presents suggests a state constitutional right that is broader than the federal constitutional right. We confine our analysis, therefore, to the federal constitution. See *State* v. *Birch*, 219 Conn. 743, 746 n.4, 594 A.2d 972 (1991); *State* v. *Braxton*, 196 Conn. 685, 688 n.2, 495 A.2d 273 (1985).

present case, he had been convicted of larceny in the third degree. Claiming that there had been insufficient evidence to sustain his conviction, the defendant had appealed the judgment against him to the Appellate Court. *State* v. *Varszegi*, supra, 33 Conn. App. 375. While that appeal was pending, the defendant was tried in the present case and the trial court allowed the state to use the larceny conviction to impeach him.[5]

Following the trial in the present case, the Appellate Court reversed the larceny conviction and remanded that case with direction to render a judgment of not guilty based upon its holding that there had been insufficient evidence of specific intent. Id., 378. Subsequently, the defendant appealed his conviction in the present case to the Appellate Court claiming, inter alia, that impeachment by the reversed larceny conviction violated his constitutional rights to present a defense, to a fair trial and to due process of law. *State* v. *Varszegi*, supra, 36 Conn. App. 685. The Appellate Court reasoned that his claim did not raise constitutional issues, but instead was solely evidentiary and, therefore, that the defendant was required to bear "the burden of establishing that there has been an erroneous ruling which was probably harmful to him." (Internal quotation marks omitted.) Id., 686. The court determined that the defendant had not met this burden and, therefore, that he could not prevail on his claim, and affirmed the judgment of the trial court. Id. Pursuant to General Statutes § 51-197f, the defendant petitioned for and was granted certification to appeal this issue to this court. We affirm the judgment of the Appellate Court, but with different reasoning.

[5] The trial court had previously denied the defendant's motion in limine, which requested that the court preclude the state from impeaching him with his prior felony convictions on the ground that their prejudicial effect far outweighed their probative value.

Generally, the use of prior convictions for impeachment purposes is treated as an evidentiary issue unless there is a resulting denial of fundamental fairness or of a specific constitutional right. *State* v. *Braswell*, 194 Conn. 297, 307–308, 481 A.2d 413 (1984), cert. denied, 469 U.S. 1112, 105 S. Ct. 793, 83 L. Ed. 2d 786 (1985); *State* v. *Periere*, 186 Conn. 599, 611, 442 A.2d 1345 (1982); see also Fed. R. Evid. 609 (a) (certain convictions admitted "if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused"). In the present case, the Appellate Court followed the majority rule, which provides that the trial judge is vested with the discretion "to allow the use for impeachment of a conviction under appeal, although he must, of course, allow defense counsel to point out the pendency of an appeal to the jury." (Internal quotation marks omitted.) *State* v. *Varszegi*, supra, 36 Conn. App. 686; *State* v. *Schroff*, 3 Conn. App. 684, 689, 492 A.2d 190 (1985). This is also the rule set forth in rule 609 (e) of the Federal Rules of Evidence.[6]

The defendant concedes that the federal rule, on its face, would sustain the trial court's ruling in the present case, but he maintains that rule 609 (e) does not "adequately consider" the constitutional issues raised in the

---

[6] Rule 609 (e) of the Federal Rules of Evidence provides: "The pendency of an appeal therefrom does not render evidence of a conviction inadmissible. Evidence of the pendency of an appeal is admissible." The Federal Rules of Evidence were originally promulgated by the United States Supreme Court, and were subsequently considered, amended and enacted into law by Congress. 2 C. McCormick, Evidence (4th Ed. 1992) p. 547. Rule 609 (e) is one of the rules enacted by Congress in the same form as promulgated by the United States Supreme Court. Id., p. 623, citing note by Federal Judicial Center. The advisory committee notes in connection with rule 609 (e) reflect the principle underlying the rule: "The presumption of correctness which ought to attend judicial proceedings supports the position that pendency of an appeal does not preclude use of a conviction for impeachment. . . . The pendency of an appeal is, however, a qualifying circumstance properly considerable." 56 F.R.D. 183, 272 (1972).

present case.[7] Rule 609 (e) of the Federal Rules of Evidence allows the use of convictions on appeal, for the purpose of impeachment, and does not address the outcome of the appeal. See *United States* v. *Mitchell,* 886 F.2d 667, 671 (4th Cir. 1989); *United States* v. *Klayer,* 707 F.2d 892, 895 (6th Cir.), cert. denied, 464 U.S. 858, 104 S. Ct. 180, 78 L. Ed. 2d 161 (1983); *United States* v. *Vanderbosch,* 610 F.2d 95, 97 (2d Cir. 1979); *United States* v. *Klein,* 560 F.2d 1236, 1240 (5th Cir. 1977), cert. denied, 434 U.S. 1073, 98 S. Ct. 1259, 55 L. Ed. 2d 777 (1978). The question presented in the present case, however, is not whether the trial court improperly allowed the prior larceny conviction on appeal to be used for impeachment purposes. Rather, the question is whether, after having learned that the prior conviction on appeal has been reversed for insufficient evidence, we must conclude, in retrospect, that the use of the prior conviction for impeachment purposes deprived the defendant of his rights to a fair trial and due process of law.

While both our common law rules of evidence and rule 609 (e) of the Federal Rules of Evidence suggest that the admissibility of prior convictions on appeal is an evidentiary question, not dependent on the outcome of the appeal, there are situations in which courts have determined that a successful appeal may have retroactive ramifications on a conviction in which the prior conviction was used to impeach the defendant. *Loper* v. *Beto,* 405 U.S. 473, 480, 92 S. Ct. 1014, 31 L. Ed. 2d 374 (1972); *Biller* v. *Lopes,* 834 F.2d 41, 46 (2d Cir. 1987). Prior to the enactment of the Federal Rules of Evidence, the United States Supreme Court addressed an issue similar to that raised in the present case. See

[7] We do not adopt rule 609 (e) as a matter of state law. Rather, we refer to it only insofar as it is relevant to the certified question of whether the defendant's federal constitutional right to due process was violated in the present case.

*Loper* v. *Beto*, supra, 473. The defendant argues that *Loper* supports his assertion that, if a constitutional defect inheres in a prior conviction, then the use of that conviction to impeach the defendant at trial requires automatic reversal, without regard to the extent of its effect on the trial. We disagree.

In *Loper*, the court held that the impeachment of a criminal defendant with an uncounseled prior conviction, subsequently reversed pursuant to the court's decision in *Gideon* v. *Wainwright*, supra, 372 U.S. 335 (establishing constitutional right to counsel and applying decision retroactively), deprived the defendant of due process of law because its use might have influenced the outcome of the case. *Loper* v. *Beto*, supra, 405 U.S. 480. In *Loper*, the defendant had been charged with statutory rape of his eight year old stepdaughter. Id., 474. She was the sole witness who identified him as the perpetrator of the crime and he was the sole witness for the defense. Id. In reliance on its decision in *Burgett* v. *Texas*, 389 U.S. 109, 115, 88 S. Ct. 258, 19 L. Ed. 2d 319 (1967), in which the court held that the use of a conviction obtained in violation of *Gideon* either to support guilt or to enhance punishment for another offense violated a defendant's right to due process; see also *Loper* v. *Beto*, supra, 493 (Burger, C. J., dissenting); the court concluded that the use of such a conviction to impeach a defendant's credibility is constitutionally invalid because "the obvious purpose and likely effect of impeaching the defendant's credibility is to imply, if not prove, guilt."[8] Id., 483, quoting *Gilday* v. *Scafati*, 428 F.2d 1027, 1029 (1st Cir. 1970).

Contrary to the defendant's reading of *Loper*, the court did not rely solely on the fact that the defendant

---

[8] The court noted that the "issue of innocence or guilt in this case turned entirely on whether the jury would believe the testimony of an [eight year old] girl or that of [the defendant]." *Loper* v. *Beto*, supra, 405 U.S. 482.

had been impeached with a prior conviction that was subsequently invalidated under *Gideon* in determining that the defendant had been deprived of his right to due process. Rather, the court focused on two factors in reaching its decision: (1) that the prior conviction was overturned based on a constitutional violation that affects "the very integrity of the fact-finding process";[9] *Loper* v. *Beto,* supra, 405 U.S. 484; and (2) that the use of the constitutionally invalid conviction "might well have influenced the outcome of the case" in which it was subsequently used to impeach the defendant. Id., 480. Thus, the defendant had the burden of showing likely harm as a condition precedent to establishing the due process violation.[10]

The defendant also relies on *Biller* v. *Lopes,* supra, 834 F.2d 41, to support his claim. Specifically, he argues that *Biller* suggests that when a prior conviction, subsequently reversed on constitutional grounds, is used to impeach a defendant, automatic reversal of the

[9] Cf. C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 7.21.6 ("*Loper* rests on the rationale that lack of counsel goes to 'the very integrity of the fact-finding process,' making the conviction unreliable proof of guilt. Thus *Loper* does not support exclusion of other constitutionally infirm convictions, such as those obtained with illegally obtained evidence, that do not vitiate the trustworthiness of the conviction. *United States* v. *Penta,* 475 F.2d 92, 94 [(1st Cir.), cert. denied, 414 U.S. 870, 94 S. Ct. 89, 38 L. Ed. 2d 88 (1973)].").

[10] The due process violation found in *Loper* is analogous to other due process violations in which the defendant, as part of establishing a due process violation, must bear the burden of proving likely harm. See, e.g., *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Gant,* 231 Conn. 43, 52, 646 A.2d 835 (1994), cert. denied,      U.S.     , 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995) (in order to establish due process violation defendant must show that prosecution suppressed evidence both favorable and material to guilt or punishment, that is, reasonable probability that, had evidence been disclosed to defense, result of proceeding would have been different); cf. *Spiegel* v. *Sandstrom,* 637 F.2d 405, 407, reh. denied, 642 F.2d 1210 (5th Cir. 1981) (reading *Loper* as holding "where the guilt or innocence of the defendant *rests on his credibility,* he is denied due process of law by use of a constitutionally invalid conviction for impeachment purposes" [emphasis added]).

resulting conviction is required, without regard to harm. We disagree.

*Biller* v. *Lopes*, supra, 834 F.2d 41, involved the state's appeal from the grant of the defendant's petition for a writ of habeas corpus by the United States District Court for the District of Connecticut; *Biller* v. *Lopes*, 655 F. Sup. 292 (D. Conn. 1987); in connection with his conviction on charges of interfering with a police officer. The defendant previously had been convicted of falsely certifying oaths, and that conviction was on appeal to this court at the time of his second trial. See *State* v. *Biller*, 190 Conn. 594, 620, 462 A.2d 987 (1983). The defendant's second trial involved charges of acting as a public adjuster without a license and interfering with a police officer. His conviction for interfering with an officer was affirmed on appeal. *State* v. *Biller*, 5 Conn. App. 616, 625, 501 A.2d 1218 (1985), cert. denied, 199 Conn. 803, 506 A.2d 146, cert. denied, 478 U.S. 1005, 106 S. Ct. 3296, 92 L. Ed. 2d 711 (1986). Both trials occurred in Connecticut state courts. During his second trial, the defendant had moved to preclude the state from using his prior conviction to impeach him if he decided to testify, because the prior conviction was on appeal. The trial court denied his motion and, as a result, the defendant did not testify. He was subsequently convicted of interfering with a police officer. Thereafter, we set aside the judgment in *State* v. *Biller*, supra, 190 Conn. 594, because the trial court improperly had admitted statements that had been compelled from the defendant by the grand jury in violation of his fifth amendment privilege against compulsory self-incrimination. We held that the admission of those statements had resulted in harm to the defendant and required a new trial. Id., 601.

Following this court's reversal of the defendant's first conviction, he filed a federal habeas corpus action to challenge the constitutional validity of his second con-

viction raising the following claims: (1) that his second conviction was the fruit of the compelled testimony obtained in his first trial in violation of the fifth and fourteenth amendments; (2) that his second conviction was based on the impeachment use of his first conviction in violation of his right to due process; and (3) that the trial judge violated his right to due process by considering his first conviction in imposing the maximum sentence. *Biller* v. *Lopes*, supra, 655 F. Sup. 296.

In connection with his first claim, the defendant argued that the trial court's decision to allow the state to impeach him with his prior conviction, if he testified, had compelled him not to testify and, consequently, had resulted in his conviction. Id. The United States Court of Appeals agreed with the District Court's determination that "the [the defendant's second] conviction was a fruit of [his first conviction's] compelled testimony, in violation of the Fifth and Fourteenth Amendments"; *Biller* v. *Lopes*, supra, 834 F.2d 45; and affirmed the judgment of the District Court.[11] Id., 46. The Court of Appeals, however, did not reach the defendant's due process claim because it affirmed the judgment of the District Court, which had decided the issue on fifth amendment grounds. See *Biller* v. *Lopes*, supra, 655 F. Sup. 305–306. "The federal district court granted the habeas corpus petition for Fifth Amendment reasons, and did not decide the other two claims, although the due process claim is kept alive in the petitioner's brief. See *Loper* v. *Beto*, [supra, 405 U.S. 473]." *Biller* v. *Lopes*, supra, 834 F.2d 43. Thus the Court of Appeals did not

---

[11] The Court of Appeals concluded that harmless error analysis was inappropriate under the circumstances of the case because the violation affected rights essential to the fundamental fairness of the trial and fell within the class of cases noted in Justice Brennan's concurring opinion in *Luce* v. *United States*, 469 U.S. 38, 44, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984), in which he stated that a constitutional violation in admitting compelled testimony for impeachment purposes is a matter of law, not an issue resting on factual consideration.

determine whether the defendant's right to due process had been violated under a *Loper* analysis and, therefore, its holding does not support the defendant's claim.

The decision in *Biller* v. *Lopes*, supra, 834 F.2d 41, does, however, emphasize an important distinction between a prior constitutional violation that pervades a subsequent trial, and a prior constitutional violation that raises due process concerns in a subsequent trial, but does not automatically establish a violation. Correspondingly, the court in *Loper* did not conclude that the defendant's right to counsel had been violated in the trial during which he was impeached with a prior conviction subsequently reversed under *Gideon*; rather, it decided the case on due process grounds. Similarly, in the present case, the defendant's claim is not that he was convicted in the second trial on the basis of insufficient evidence in the first trial; but rather, he claims that he was deprived of due process when he was impeached by the use of his prior conviction that was subsequently reversed for insufficient evidence. We conclude, therefore, that the defendant's due process claim is controlled by the holding in *Loper*.

As applied to the facts of the present case, we conclude that the defendant has satisfied the first factor on which the court relied in *Loper*. A conviction based on insufficient evidence is constitutionally invalid; *Jackson* v. *Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979); *State* v. *Roy*, 233 Conn. 211, 212, 658 A.2d 567 (1995); and such a determination affects the integrity of the fact-finding process because it definitively invalidates the factual finding of guilt. We conclude, however, that the defendant has not shown that the use of his prior larceny conviction for impeachment purposes might have influenced the outcome of the present case and, therefore, he has failed to estab-

lish the second factor on which the court focused in *Loper*.

At trial, the defendant was not impeached solely by his prior larceny conviction. Three other prior convictions were introduced to impeach the defendant's credibility.[12] Furthermore, we agree with the Appellate Court's analysis of the harm resulting from use of the prior conviction in this case: "The defendant did not dispute that he attempted to escape. Rather, his case was based on a defense of necessity. All of his evidence, including his own testimony, dealt with that defense. Because that defense was never before the jury for its consideration . . . the defendant's credibility played only a minor role in the trial."[13] *State* v. *Varszegi*, supra, 36 Conn. App. 686–87. We conclude, therefore, that the defendant was not deprived of a fair trial and due process of law when he was impeached at trial with his prior larceny conviction that was subsequently reversed on appeal.[14]

## II

The defendant's next claim invites us to establish a new standard, under which facts are viewed subjec-

[12] In addition to the larceny conviction that is at issue in this appeal, the defendant was impeached by an unnamed felony conviction and by two failure to appear convictions.

[13] "The issue of the defendant's credibility was not moot, however. Any time a defendant takes the stand in his own defense, his credibility is subject to scrutiny. *State* v. *McClendon*, 199 Conn. 5, 12, 505 A.2d 685 (1986)." *State* v. *Varszegi*, supra, 36 Conn. App. 687 n.5

[14] Because we conclude that the defendant was not deprived of his right to due process, we need not reach the second certified question, namely, whether the deprivation was harmless. As we have indicated, with respect to this particular constitutional principle, the question of harm is an essential part of the analysis of whether there was such a violation. Cf. *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (materiality is requisite to establishment of constitutional violation); *Loper* v. *Beto*, supra, 405 U.S. 483 n.12 (after concluding that defendant had been deprived of due process, court stated, "[i]n the circumstances of this case there is little room for a finding of harmless error").

tively, for determining whether, if a defendant has been charged with escape from prison, the common law defense of necessity is available. We decline to do so.

The following facts are relevant to this claim. At trial the defendant testified that his attempted escape was necessary to preserve his life.[15] He claimed that certain gang factions in the Bridgeport correctional center had threatened his life if he did not pay them for his personal protection. He further testified that, after he had paid certain extortion fees, gang members had placed a "shank" to his throat and threatened him with death if he did not increase the payments. He claimed that a "code of silence" operated within the correctional center, the effect of which was to enforce the extortion scheme.[16]

In addition, the defendant testified that during his incarceration he suffered from a serious medical condition for which, despite repeated requests, he had received no treatment. He further testified that he faced a continuous threat of contracting tuberculosis in prison and that this situation constituted a specific threat to his life.

In connection with these claims, the Appellate Court concluded the following: "[T]he trial court objectively looked at the evidence and found that, although the defendant testified that he was threatened with substan-

[15] All of the testimony regarding the defendant's concern for his safety and health had been placed before the jury in support of the necessity defense. The trial court, however, after rejecting a request to instruct the jury on the defense, specifically instructed the jury that they were not to consider the necessity defense. The court determined that, because the jury had already heard so much testimony about and allusions to necessity as a defense, some specific directions were prudent to avoid confusion.

[16] An inmate, Warren Carr, testified and corroborated the defendant's assertion that gang activity was rampant at the correctional center and that a "code of silence" was indeed in effect there. Furthermore, correction officials Joseph Norko and Gary Savoie acknowledged that the presence of gangs and the "code of silence" were a reality at the correctional center.

tial bodily injury, he had not reported [the shank episode] to prison authorities despite having three days to do so. The defendant also testified to other threats, none of which were reported to prison authorities. In addition, the trial court found that although the defendant was represented by counsel, to whom he had spoken at the jail, he failed to avail himself of the opportunity to resort to the court.

"The trial court found that the defendant's medical complaints were not futile even though they were not answered to his satisfaction. The trial court found that the defendant's fear of a tuberculosis epidemic was not founded in fact. The defendant would have us believe that his fear of contracting tuberculosis was realized, as shown in a subsequent physical examination. In fact, the subsequent tests showed only that the defendant had been exposed to tuberculosis, not that he had contracted the disease." State v. Varszegi, supra, 36 Conn. App. 689.

Employing the five part test established in People v. Lovercamp, 43 Cal. App. 3d 823, 831–32, 118 Cal. Rptr. 110 (1974),[17] and reviewing the evidence on an objective basis, the trial court concluded that the defendant had failed to present legally sufficient evidence to warrant a jury instruction on the defense of necessity. The Appellate Court agreed with the trial court's conclusion that, as a matter of law, the defendant had failed to

[17] "In Lovercamp, the California [Court of Appeals] held that, in the context of criminal escape, a limited defense of necessity is available if: (1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future; (2) there is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory; (3) there is no time or opportunity to resort to the courts; (4) there is no evidence of force or violence used towards prison personnel or other innocent persons in the escape; and (5) the prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat." (Internal quotation marks omitted.) State v. Varszegi, supra, 36 Conn. App. 688.

demonstrate that he was entitled to a jury instruction on the defense of necessity, and thus affirmed the judgment of the trial court. *State* v. *Varszegi*, supra, 36 Conn. App. 689.

In this court, the defendant does not dispute the validity of the *Lovercamp* test.[18] He argues, however, that in applying the *Lovercamp* criteria the trial court should view the facts subjectively, as the defendant perceived them, instead of objectively, from the perspective of a reasonable person.[19] He argues further that the trial court would have found a sufficient quantum of evidence to support the defense if it had considered the evidence subjectively. We disagree that the *Lovercamp* test should be applied subjectively.

"If the defendant asserts a recognized legal defense and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to a theory of defense instruction. . . . The defendant's right to such an instruction is founded on the principles of due process. *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) . . . . Before an instruction is warranted, however, [a] defendant bears the initial burden of producing sufficient evidence to inject [the defense] into the case. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Carter*, 232 Conn. 537, 545, 656 A.2d 657 (1995).

---

[18] It is undisputed in the present case that the fourth and fifth factors; see footnote 17; are inapplicable because the defendant's attempted escape was thwarted and no person was threatened, harmed or otherwise a victim of violence in the attempt.

[19] It is clear from the record that the trial court contemplated this argument and rejected it. During the course of its ruling on the necessity defense, the trial court commented on the defendant's claims that his futile complaints of poor medical treatment constituted a specific threat of death or specific bodily injury, stating that "[w]hether you subjectively believe that or not is not really the issue. The question is whether they in fact did, and I am not satisfied that you have established that."

As a general rule, a defendant is entitled to have instructions on a defense for which there is evidence produced at trial to justify the instruction, no matter how weak or incredible the claim. *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986). The defense of necessity in prison escape cases, however, entails unique considerations. As our Appellate Court has recognized, "[t]o maintain order in state correctional facilities and court lockups, and to avoid an invitation for facile excuses to attempt escapes from custody, the application of the necessity defense to criminal escapes must be strictly interpreted." *State* v. *Woods*, 23 Conn. App. 615, 620, 583 A.2d 639 (1990).

In prosecutions for escape from prison, the defense of necessity has its roots in the common law.[20] In the early eighteenth century, it was widely recognized that necessity might justify escape in certain situations. "In 1 Hale P.C. 611 (1736), it was written that if a prison caught fire and a prisoner departed to save his life, the necessity to save his life 'excuseth the felony.'" *People* v. *Lovercamp*, supra, 43 Cal. App. 3d 826. By the middle of the nineteenth century, the notion that not all departures from lawful custody constitute a separate crime was firmly established in American jurisprudence. See *United States* v. *Kirby*, 74 U.S. (7 Wall.) 482, 487, 19 L. Ed. 278 (1869).

Today, the defense of necessity in prison escape cases is almost universally recognized. See generally 30A C.J.S., Escape § 11 (1992). The seminal case that defines the boundaries of the necessity defense in prison escape cases is *People* v. *Lovercamp*, supra, 43

---

[20] The common law defense of necessity is preserved under the savings clause of General Statutes § 53a-4, which provides: "The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions." See also *State* v. *Woods*, supra, 23 Conn. App. 617 n.1; *State* v. *Messler*, 19 Conn. App. 432, 439 n.5, 562 A.2d 1138 (1989).

Cal. App. 3d 826, in which the California Court of Appeals established a five part test that must be satisfied before the necessity defense is available to a criminal defendant.[21] See footnote 17. Our Appellate Court previously adopted the *Lovercamp* criteria to govern the availability of the necessity defense in prison escape cases in *State* v. *Woods*, supra, 23 Conn. App. 615. In recognition of the *Lovercamp* court's admonition regarding the potential for abuse of the defense by those who simply want to avoid the admittedly unpleasant situation of incarceration, however, the defense is now considered a very narrow one to which "severe limitations [are] affixed." *People* v. *Lovercamp*, supra, 826. For example, a defendant will not be entitled to a jury instruction on the necessity defense if the defendant makes a general allegation that the conditions of incarceration are untenable or unsanitary. See, e.g., *State* v. *Mulalley*, 126 Ariz. 278, 282–83, 614 P.2d 820 (1980); *State* v. *Palmer*, 45 Del. 308, 310, 72 A.2d 442 (1950); *State* v. *Cahill*, 196 Iowa 486, 490, 194 N.W. 191 (1923); *State* v. *Moore*, 621 S.W.2d 107, 109 (Mo. App. 1981); *State* v. *Cross*, 58 Ohio St. 2d 482, 487, 391 N.E.2d 319 (1979); *Davis* v. *State*, 763 P.2d 109, 110 (Okla. Crim. App. 1988), cert. denied, 489 U.S. 1055, 109 S. Ct. 1319, 103 L. Ed. 2d 588 (1989). As one commentator has noted, "[t]he right to better treatment, however, does not entail the right to escape." G. Fletcher, "Should Intolerable Prison Conditions Generate a Justification or an Excuse for Escape?" 26 UCLA L. Rev. 1355, 1365 (1979).

At the outset, we note that the defendant has not cited, nor has our research disclosed, any support for the subjective standard that he advocates. Indeed, the objective standard is well established as the approach

[21] Some jurisdictions do not regard the *Lovercamp* criteria as inveterate, but rather as factors to be considered by the jury in its consideration of the defendant's credibility regarding his explanation of the alleged necessity. See, e.g., *People* v. *Unger*, 66 Ill. 2d 333, 342, 362 N.E.2d 319 (1977).

used in most jurisdictions that have considered the issue in applying the *Lovercamp* criteria.[22] We find no reason to reject the majority rule regarding the use of an objective standard.

The objective standard is supported by the compelling rationale that the utilization of a subjective standard would be highly impractical in the context of prison escapes. Prisons are not places where reasonable people desire to find themselves. At best, prison conditions are chilling. As the California Court of Appeals cogently noted, "[i]t takes little imagination to conjure stories which could be used to indicate that to the subjective belief of the prisoner, conditions in prison are such that escape becomes a necessity." *People* v. *Lovercamp*, supra, 43 Cal. App. 3d 826. Because of the potential for contrived allegations about prison conditions that could constitute the elements of a necessity defense, the defense must be a limited one. In recognition of this, the California Court of Appeals set forth criteria not in terms of the subjective beliefs of a defendant, but in terms of facts that actually are found to exist. Id., 831 (availability of defense is established "if the following conditions *exist*" [emphasis added]). "[The subjective] approach would be most unwise as subjective beliefs are easily fabricated and almost impossible to disprove." *United States* v. *Lopez*, 885 F.2d 1428, 1433–34 (9th Cir. 1989), cert. denied, 493 U.S. 1032, 110 S. Ct. 748, 107 L. Ed. 2d 765 (1990).

Moreover, "[t]he necessity defense embodies the underlying rationale that public policy favors the com-

---

[22] See, e.g., *United States* v. *Lopez*, 885 F.2d 1428, 1433 (9th Cir. 1989), cert. denied, 493 U.S. 1032, 110 S. Ct. 748, 107 L. Ed. 2d 765 (1990) (holding that test for whether threats lost their coercive force is objective one); *People* v. *Lovercamp*, supra, 43 Cal. App. 3d 826–27 (limiting defense of necessity to avoid problem of subjective belief of prisoner); *People* v. *Condley*, 69 Cal. App. 3d 999, 1010, 138 Cal. Rptr. 515, cert. denied, 434 U.S. 988, 98 S. Ct. 619, 54 L. Ed. 2d 483 (1977) (concluding that it would be ludicrous to apply subjective standard); *State* v. *Mills*, 117 Idaho 534, 537,

mission of a lesser harm (the commission of what otherwise would be a crime) when this would avoid a greater harm." (Internal quotation marks omitted.) Note, "Escape from Cruel and Unusual Punishment: A Theory of Constitutional Necessity," 59 B.U. L. Rev. 334, 338 (1979). In other words, because the necessity defense in prison escape cases rests on the principle of justification, we are, in essence, balancing the competing evils of the escape of a legitimately incarcerated person against prison conditions that would specifically threaten that prisoner's life. Even if justified, however, the "lesser evil," namely, the presence of an escaped prisoner in our society, is significant. As a matter of public policy, in such a situation we must adopt a standard governing the availability of the defense that provides the most strict indicia of reliability. That standard is the objective one. "To hold otherwise would be to allow escapees the benefit of a necessity defense whenever they claim that they [satisfied the criteria] because, subjectively, they still feared for their lives." *United States* v. *Lopez*, supra, 885 F.2d 1433. We conclude that the objective standard best comports with the narrow parameters that must attend the necessity defense in prison escape cases. The defendant, therefore, was not entitled to a jury instruction on this defense.[23]

The judgment of the Appellate Court is affirmed.

789 P.2d 530 (1990) (adopting well settled principle that necessity defense in escape context is governed by objective, not subjective, standard); *State* v. *Stuit*, 176 Mont. 84, 90, 576 P.2d 264 (1978) (agreeing with objective standard imposed by *Lovercamp*).

[23] In the alternative, the defendant argues that, even if an objective test were properly employed, the trial court nonetheless should have submitted the question of necessity to the jury. On its face, we view this argument as an attack on the trial court's conclusions regarding the sufficiency of the evidence to support the necessity defense. Because we conclude that the Appellate Court properly held that the objective test is the operative one with respect to the necessity defense, we need not, therefore, address this claim. The defendant's alternative argument is beyond the scope of the questions certified for appeal and, accordingly, we decline to address it.

In this opinion PETERS, C. J., BORDEN and KATZ, Js., concurred.

BERDON, J., concurring. I write separately with respect to the issue of impeaching a criminal defendant with a conviction of a crime that is on appeal. The majority embraces rule 609 (e) of the Federal Rules of Evidence[1] that allows for such an impeachment.[2] The court, however, recognizes that notwithstanding rule 609 (e), where a defendant is impeached with a prior conviction that is subsequently overturned on appeal, a retrial is required if (1) the prior conviction was over-

---

[1] Despite the majority's claim in footnote 7 that it is not adopting rule 609 (e) as a matter of state law, the majority's approval of employing prior convictions pending appeal for impeachment purposes leads me to believe that it is in fact embracing rule 609 (e).

[2] The time is ripe for this court to reexamine the law as it pertains to admitting evidence of prior convictions to impeach a criminal defendant. Such impeachment evidence has been described by one commentator as having the "sharpest and most prejudicial impact" on the accused in a criminal case who elects to take the stand and testify. 1 C. McCormick, Evidence (4th Ed. 1992) § 42, p. 153. "If the accused is forced to admit that he has a 'record' of past convictions, particularly if the convictions are for crimes similar to the one on trial, there is an obvious danger that the jury, despite instructions, will give more heed to the past convictions as evidence that the accused is the kind of [person] who would commit the crime on charge, or even that he ought to be put away without too much concern with present guilt, than they will to the legitimate bearing of the past convictions on credibility. The accused, who has a 'record' but who thinks he has a defense to the present charge, is thus placed in a grievous dilemma. If he stays off the stand, his silence alone will prompt the jury to believe him guilty. If he elects to testify, his 'record' becomes provable to impeach him, and this again is likely to doom his defense. Where does the balance of justice lie? Most prosecutors would argue with much force that it would be misleading to permit the accused to appear as a witness of blameless life, and this argument has prevailed widely. An intermediate view, between permitting convictions generally to be introduced and excluding all convictions of the accused to impeach him as a witness, is a proposal that the convictions be restricted to those supposedly bearing directly upon character for truthfulness." Id. Under the current state of the law, the admissibility of prior convictions to impeach a criminal defendant is subject to the trial court's discretion. *State* v. *Nardini*, 187 Conn. 513, 520, 522, 447 A.2d 396 (1982). In my view, at the very least, the previously mentioned concerns should be taken into account when that discretion is exercised.

turned based on a constitutional violation, and (2) the use of the constitutionally invalid conviction "might well have influenced the outcome of the case" in which it was subsequently used to impeach the defendant. *Loper* v. *Beto*, 405 U.S. 473, 480, 92 S. Ct. 1014, 31 L. Ed. 2d 374 (1972); *Biller* v. *Lopes*, 834 F.2d 41, 45–46 (2d Cir. 1987).

In my view, notwithstanding the federal rule, a conviction that is on appeal should never be used to impeach a defendant. The prejudice to a defendant with respect to impeaching him or her with an invalid conviction, whether that invalid conviction is reversed because of a constitutional violation or for any other reason, is too great. Therefore, under "our inherent supervisory authority over the administration of justice"; *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 129 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); we should adopt a rule for all future cases prohibiting the introduction of prior convictions for impeachment purposes that are on appeal.

Nevertheless, like the majority, I am of the opinion that in this case the introduction of the prior conviction that was reversed was harmless error. Accordingly, I concur in the result.